**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| THOMAS BUCKLEY, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 09-4275 (FLW) |
| | : | |
| v. | : | |
| | : | **OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**WOLFSON: United States District Judge:**

Thomas Buckley ("Plaintiff") seeks review of the final decision of the Commissioner of Social Security ("the Commissioner") partially approving Plaintiff's application for disability insurance benefits ("DIB"). The Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Plaintiff contends that the administrative law judge ("ALJ") erred when setting Plaintiff's disability onset date seventeen months beyond the date claimant contends he became disabled. Specifically, Plaintiff maintains that the ALJ was required to call a medical expert to assist him in inferring the onset date. After reviewing the Administrative Record, this Court finds that the ALJ's determination was not supported by substantial evidence. For the reasons set forth herein, the Court will remand this case for a determination of the onset date of Plaintiff's disability.

## I. OVERVIEW

**A. Procedural History**

On November 7, 2005, Plaintiff filed an application for DIB alleging disability as of April 30, 2003. The Social Security Administration ("SSA") found Plaintiff to be disabled with

an onset date of October 10, 2005.  Upon a request for reconsideration, the SSA affirmed the October 10, 2005 disability onset date.  Thereafter, Plaintiff filed an appeal requesting a hearing before an ALJ, which was held on August 23, 2007.  At the hearing, Plaintiff amended his onset date to June 1, 2004.  On September 11, 2007, the ALJ rendered a decision, finding that while Plaintiff did have medically determinable impairments such as a history of polycystic kidney disease, gout, hypertension, clogged arteries, cardiomyopathy, and a history of cerebral vascular accident that rendered him disabled beginning October 10, 2005, he was not under a disability within the meaning of the Social Security Act ("the Act") before that date.  Thus, Plaintiff was only entitled to DIB from October 10, 2005.  Plaintiff sought review, which the Appeals Council denied on June 18, 2009.  Plaintiff now appeals that denial.

**B. Background**

Plaintiff was born on July 12, 1945.  Administrative Record ("AR") 23.  Before filing for DIB, he worked for approximately 23 years as a maintenance supervisor.  AR 234.  Plaintiff claims he stopped working in 2003 when he was laid off due to the bankruptcy of his employer.  AR 56, 234.  According to Plaintiff, symptoms of gout and arthritis that had negatively affected his job performance worsened following his firing, but he did not visit the doctor because he had neither insurance nor the money to seek treatment.  AR 240.  On October 8, 2005, Plaintiff was seen at Saint Barnabas Health Care Systems Community Medical Center complaining of a headache and dizziness that had persisted for two to three days with an unsteady gait.  AR 118.  Plaintiff was admitted to the hospital.  AR 121-23.  According to Plaintiff's attorney, Plaintiff has been unable to do light work since June 1, 2004.  AR 236-37.  Plaintiff has not worked since being laid off in 2003.  AR 239.

**C. Medical Evidence**

Various medical records confirm Plaintiff's ailments.

**1. Medical Evidence prior to October 10, 2005**

The record contains various notes and reports from doctors who have treated and/or examined Plaintiff following his admission to Community Medical Center on October 8, 2005, but the record contains no medical evidence prior to then.

On October 8, 2005, Plaintiff was seen by Dr. Leslie S. Cauvin, who noted that Plaintiff exhibited elevated blood pressure and had a past medical history of polycystic disease, hypertension and renal insufficiency.  AR 118.  Dr. Cauvin found Plaintiff positive for dizziness and headache, and wrote that he had an unsteady gait.  *Id*.  Dr. Cauvin's impression was that Plaintiff had hypertension, acute renal failure, chronic renal insufficiency and a history of polycystic kidney disease.  AR 119.  Dr. Cauvin admitted Plaintiff to telemetry.  *Id*.

On October 9, 2005, Plaintiff saw Dr. Rocco Dipaola for his complaints of dizziness, imbalance and headache.  AR 121.  Plaintiff also complained of intermittent double vision, a frontal headache over his left eye and blurred vision when looking straight.  *Id*. Dr. Dipaola noted that Plaintiff had a history of polycystic kidney disease and that he had been found to have mild renal failure upon admission.  *Id*.  Dr. Dipaola observed Plaintiff's movement was marked by slow, short steps.  *Id*. Dr. Dipaola also noted that Plaintiff exhibited some lightheadedness when going from lying to sitting down or sitting to standing.  *Id*.

A computer tomography (CT) scan of Plaintiff's brain showed "evidence of a right pericaudate and bilateral deep white mater lacunar infarct."  AR 122.  Dr. Dipaola's impression was "hypertensive urgency / emergency, rule out cerebral infarct," and hyperlipidemia.  *Id*.  An echocardiogram ("Cardiac ECHO") was also performed on October 9, 2005.  AR 151.  The results showed: Plaintiff's left ventricle was moderately dilated; there was mild concentric left

ventricular hypertrophy; moderate global hupokinesis of the left ventricle; mild mitral regurgitation; mild to moderate tricuspid regurgitation; and mild to moderate aortic regurgitation. AR 152. Ejection fraction was found to equal 35-40%. *Id*.

**2. Post-Coverage Medical Evidence (After October 10, 2005)**

On October 10, 2005, Plaintiff saw Dr. John Depalma for renal consultation and associated comorbid diagnoses including hypertension.  AR 124.  Plaintiff stated that approximately three years prior, while he was hospitalized with severe right flank pain, he was told he had polycystic kidney disease.  *Id*. Additionally, during that hospitalization it was discovered that his renal function was abnormal.  *Id*.  Plaintiff stated that after running out of medications he did not renew them because he thought that he could control his condition with his diet. *Id*.

On examination, Dr. Depalma noted that Plaintiff was awake, alert, well developed, nourished and showed no distress.  AR 125.  Plaintiff's heart exam was normal, his lungs were clear bilaterally and he was neurologically intact.  *Id*.  Dr. Depalma reviewed the Cardio ECHO results and wrote that Plaintiff was demonstrating "moderately dilated left ventricle with left ventricle hypertrophy, also moderate global hypokinesia with ejection fraction 35% to 40%, dilated left atrium, mild-to-moderate atrial insufficiency and mild mitral regurgitation, [and] mild-to-moderate tricuspid regurgitation."  The doctor noted several impressions, including hypertensive urgency, "chronic kidney disease, probably at stage 3, secondary to polycystic kidney disease[,]" hypertensive urgency, a history of right flank pain, "[previous] diagnosis of polycystic kidney disease[,]" hyperlipidemia, cardiomyopathy, "probably a combination of ischemic, as well as hypertensive[,]" and "probably chronic obstructive pulmonary disease."  AR 125-26.

4

Plaintiff's discharge report, also from October 10, 2005, reported that Plaintiff had severe atherosclerotic changes in the region of the carotid bulb with calcific and soft plaque, which was causing narrowing of the lumen with elevations of the velocities up to 217 cm/s.  AR 134.  This was consistent with severe narrowing in the proximal internal carotid artery.  *Id*.  Additionally, a retroperitoneal ultrasound demonstrated markedly enlarged kidneys, which was believed to be associated with polycystic kidney disease.  *Id*.

Also on October 10, 2005, results of magnetic resonance imaging ("MRI"), lumbarsptoday and CT exams were released.  An MRI of Plaintiff's brain showed: 1) No evidence of acute infarct; 2) age related periventricular microvascular ischemic changes; 3) "small focal lacunar infarct, probably old right parietal"; and 4) age related atrophy.  AR 146.  Results of a lumbarsptoday of the frontal, lateral and oblique views of Plaintiff's lumbar spine identified no definite fractures and noted mild degenerative changes with osteophyte formations.  AR 147.  The CT of Plaintiff's abdomen and pelvis showed: 1) enlarged kidneys most consistent with polycystic renal disease; 2) partial staghorn calculus suggested in lower pole of the left kidney with additional calculi noted; 3) there is no evidence for renal obstruction; 4) multiple low attenuation masses noted in the liver are likely related to renal cortical cysts; and 5) mild ectasia of the abdominal aorta as described above.  AR 148-49.

On October 11, 2005, Plaintiff saw Dr. Munir Ahmed.  AR 120.  Plaintiff noted a history of back pain, mostly in the left leg area, with no radiation down the legs.  *Id*.  Dr. Ahmed reported that Plaintiff's systems were normal except with reference to the left hip and back area. Dr. Ahmed noted tenderness in the left lumbar area, but concluded that nothing aggressive was indicated and recommended that he come back with any further problems.  On the same day

treatment notes from Community Health Center showed Plaintiff was being treated for hypertension.  AR 128-30.

Plaintiff was also hospitalized from November 10, 2005 to November 26, 2005.  AR 154. On November 10, 2005, he came to Community Medical Center complaining that he had difficulty walking and generalized weakness.  AR 156.  On that day he saw Dr. Kirit Pandya and Dr. Ranvir Ahlawat.  AR 154, 176.  After complaining to Dr. Pandya of flanks pain, renal failure and body weakness, a renal ultrasound was performed that revealed bilateral renal polycystic kidney disease without any evidence of kidney stones or hydronephrosis.  AR 176.  Dr. Pandya noted that Plaintiff had been "having some difficultly relating namely mild-to-moderate prostatism with urinary urgency and frequency with occasional dysuria."  *Id*.  Dr. Pandya's impressions were: bilateral polycystic kidney disease; left flank pain; no evidence of hydronephrosis or stones or urological pain; renal failure; gait disturbance; left hemiparesis; and anemia.  AR 177.  Dr. Ahlawat saw Plaintiff for his left flank pain, which Plaintiff said had been getting progressively worse after starting two months prior.  AR 156. Dr. Ahlawat noted that Plaintiff had a past medical history of hypertension, polycystic kidney disease, ischemic cerebovacular accident and renal insufficiency.  *Id*.  Plaintiff also complained of chronic left leg pain and an intermittent inability to put weight on his legs and loss of vision.  *Id*.

After being admitted to the emergency room the previous day, on November 11, 2005, Plaintiff saw Dr. Christian Enescu.  AR 170.  Plaintiff complained that pain in his knee joints prevented him from walking.  *Id*.  Dr. Enescu's impressions were gait disturbance, multifactorial probably due to bilateral knee joint pain with effusion also due to left lower extremity weakness after the stroke; status post old right-sided stroke with residual left hemiparesis; bilateral knee

joint effusion; anemia; renal failure; and polycystic kidney disease.  AR 171-72. The doctor ruled out both rheumatoid arthritis and septic arthritis.  *Id*.

Also on November 11, 2005, Plaintiff saw Dr. Daniel Brouder for management of his renal insufficiency.  AR 173.  Dr. Brouder described Plaintiff's chronic kidney disease as being secondary to polycystic kidney disease.  *Id*.  Plaintiff noted his sister, brother and father have a history of polycystic kidney disease.  *Id*.  Plaintiff's past medical history was noted to include chronic kidney disease, polycystic kidney disease, hypertension, nephrolithiasis, hyperlipidemia, cardiomyopathy and COPD.  *Id*.  Dr. Brouder believed that plaintiff was in no respiratory distress and that his heart and lungs were normal.  AR 174.  Dr. Brouder's assessment was: acute renal failure on chronic kidney disease; left flank pain; hypertension; a history of nephrolithiasis; hyperlipidemia; cardiomyopathy; and chronic obstructive pulmonary disease.  AR 174-75.

On November 14, 2005, Plaintiff saw Dr. Rajat Dhar for positive septic arthritis.  AR 166.  He complained of generalized weakness with left leg and flank pain, as well as bilateral knee pain for a long period of time and ankle pain and swelling.  *Id*.  Dr. Dhar stated that Plaintiff had fallen that day and was experiencing hallucinations.  *Id*.  Dr. Dhar's impression was septic arthritis of the right knee, most likely staphylococcus aureus; renal insufficnecy with a history of polycystic kidney; and history of gout.  AR 167.  Dr. Dhar drained Plaintiff's bilateral knees on or around November 14, 2005, and assessed Plaintiff as having polyarticular gout.  AR 169.

On November 16, 2005, Plaintiff saw Dr. Shahid Haque as a result of a finding of critical right carotid artery stenosis with a history of multiple transient ischemic attacks and stroke.  AR 161.  Dr. Haque described Plaintiff as having a psychiatric disorder with psychosis and delirium secondary to his medical condition.  *Id*.  The doctor reported that Plaintiff's lungs were clear, his

heart sounds were audible, and he had no definite arrhythmia.  AR 162.  Plaintiff's left side reflexes were hyperreflexic and both of his knees were arthritic, with the left side worse than the right.  *Id*.  Dr. Haque's diagnostic impression was: critical right carotid artery stenosis with possibly recurrent transient ischemic attacks and completed stroke; right cerebral infarction in the parietal area; hypertension; chronic renal insufficiency; and possible coronary artery disease. *Id*.  Dr. Haque identified Plaintiff as being at high risk for stroke, coronary complications, and renal failure.  *Id*.

Also on November 16, 2005, Plaintiff consulted with Zulfigar Rajput because he was feeling weak.  AR 164.  Dr. Rajput described Plaintiff as appearing very lethargic and tried, and wrote that Plaintiff was hallucinating.  *Id*.  Dr. Rajput's impression was that Plaintiff was suffering delirium and psychosis due to his general medical condition, as well as polycystic kidney disease, gout hypertension, and cerebrovascular accident.  AD 165.  The doctor recommended an increase in his dose of risperdal before his discharge.  *Id*.

On November 20, 2005, Plaintiff saw Dr. Scott Eisenberg for a cardiac clearance in preparation for a carotid endarterectomy.  AR 158.  Dr. Eisenberg reported that Plaintiff had a cerebrovascular accident approximately two months prior to the consultation, and that Plaintiff had returned to the Community Medical Center with visual disturbances and a carotid ultrasound and MRA consistent with critical right internal carotid artery stenosis.  *Id*.  Dr. Eisenberg described Plaintiff as alert and oriented, but also lethargic and prone to falling asleep during conversations.  AR 159.  Dr. Eisenberg examined Plaintiff and found his heart "regular with soft systolic murmur at the right sternal border and S4 gallup." *Id*.  Dr. Eisenberg, in recognition of Plaintiff being at moderate to high risk for the operating room, recommended a 2-D echocardiogram and adenosine nuclear stress test be performed the following day.  *Id*.

On November 22, 2005, Plaintiff underwent a right carotid endarterectomy with patch angioplasty for his critical right carotid artery stenosis with transient ischemic attack. AR 179. The degree of the stenosis was found to be over 95%. *Id*. Plaintiff's surgeon, Dr. Shahid N. Haque, reported that he tolerated the procedure well and showed no evidence of any neurological defects. AR 180.

On November 26, 2005 Plaintiff was discharged from Community Medical Center. AR 154. The discharge summary reflected Plaintiff's history of having gout for years in different joints, including both knees. *Id*. Plaintiff stated that he believed dietary problems were to blame. *Id*. On examination, the attending physician found Plaintiff showed no effusion in the left knee and moderate effusion in the right knee. *Id*. The physician also believed Plaintiff had bilateral pitting edema in the ankles and legs with the right being worse than the left. *Id*. Plaintiff was capable of flexing and extending both knees without undue discomfort through at least 45 degrees flexion. *Id*. Some pain on rotation of Plaintiff's hip was noted. *Id*. The physician concluded that Plaintiff was suspicious for gout and for infection. AR 155.

On March 14, 2006, Plaintiff was examined by William Coffey, Psy. D. AR 191-93. Plaintiff's medical history noted a diagnosis of polycystic kidney disease and hypertension, as well as procedures he'd undergone for a clogged carotid artery and a cyst on his colon. AR 191-92. Plaintiff had swelling in his hands and feet, but he did not know why. AR 192. Plaintiff indicated that he did not remember what he did for a living before later saying that he did construction on and off for family members. *Id*. Plaintiff reported that he lived alone but was supported by his brother and two sisters in performing tasks like laundry and shopping. *Id*. Plaintiff stated that while he does attend to his own self-care, he had been unable to shave that

day because his hands were shaking.  *Id*.  Plaintiff reported that his days are spent watching TV. *Id*.

On examination, Dr. Coffey found his eye contact and speech quality were normal, and reported no evidence of a thought disorder.  *Id*.  Dr. Coffey characterized Plaintiff's gait as slow and stiff, and noted that Plaintiff had needed help standing.  *Id*.  Dr. Coffey indicated that Plaintiff's insight, judgment, and understanding were adequate, but that he had poor concentration.  AR 193.  Dr. Coffey believed that Plaintiff was likely to perform at a very poor pace and persistence, and that he appeared cognitively dulled with limited social interaction skills.  *Id*.

On March 17, 2006, state psychiatrist Dr. M. Apacible reviewed the medical evidence and completed a mental residual functional capacity assessment.  AR 210-11.  Plaintiff was found to be not significantly limited in eleven assessment areas[1], moderately limited in six assessment areas[2], and markedly limited in three assessment areas[3].  *Id*.  Dr. Apacible believed that Plaintiff was able to understand, remember, and execute simple instructions.  AR 212.  Dr.

---

[1] Specifically, Plaintiff was found to be not significantly limited in the following areas: the ability to remember locations and work-like procedures, understand and remember very short and simple instructions, carry out those instructions, work in coordination with or proximity to others without being distracted by them, make simple work-related decisions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independent of others. AR 210-11.

[2] Moderate limitations were found in the following areas: the ability to understand and remember detailed instructions, carry out detailed instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, interact appropriately with the general public, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  *Id*.

[3] Marked limitations were found in the following areas: the ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in the work setting. *Id*.

Apacible concluded by noting that while Plaintiff was able to relate, he could not adapt or maintain pace and persistence. *Id.*

On April 8, 2006, Plaintiff was examined by Dr. Francky Merlin of Point Pleasant Medical Associates. AR 194-96. Plaintiff told Dr. Merlin that his high blood pressure was diagnosed twelve years prior, and that he had suffered three strokes over a three month period that affected the left side of his body in the form of weakness and numbness in the left leg. AR 194. Dr. Merlin noted that Plaintiff's systems were remarkable for ankle pain. *Id.* His past medical history was remarkable for bilateral inguinal hernia repair. *Id.* Plaintiff's lungs were clear and his heart was normal. AR 195. The doctor observed that Plaintiff's station was normal but his gait was shuffling. Plaintiff exhibited difficulty dressing, undressing, and getting up from a chair and on and off the examining table. *Id.* Plaintiff required a cane to ambulate on all types of surfaces for walking, support and balance. AR 196. Dr. Merlin's diagnosis was uncontrolled hypertension, left shoulder arthralgia, and a history of cerebral vascular accident. *Id.*

**D.  Non-Medical Evidence**

Plaintiff filled out a Function Report, Pain Report, and Functional Assessment questionnaire for the SSA on December 11, 2005. AR 68-85. Plaintiff's reports were in-line with the complaints that he'd made to doctors over the prior two months. When queried about the activities he participates in, and how his conditions have affected them, he responded, "Don't have any interest in reading – Blurred vision – Walking get too tired." AR 72. When asked to provide additional remarks, Plaintiff wrote that he "had been feeling sick for 3 years. Didn't know [how] sick I was until my sister took control of me and brought me to a [doctor]." AR 75. In the Pain Report, Plaintiff wrote that, "It feels as though someone is sticking a knife in me and won't stop." AR 80. Plaintiff also wrote that following his first stay at Toms River Community

11

Hospital in October, 2005, ". . . I went to a rehab for 11 days to learn how to walk again.  I had had 2 strokes prior to my operation.  I had to learn to walk and talk again."  AR 82.

Plaintiff's sister, Carol Sullivan, filled out a Third Party Function questionnaire on December 11, 2005.  AR 101.  She wrote that she had spent many hours together with Plaintiff for "[t]he last 3 years . . . trying to get him better."  *Id*.

Plaintiff's Federal Insurance Contributions Act ("FICA") records showed that Plaintiff earned $5807.05 in 2003.  AR 56.  Following 2003, Plaintiff showed no earnings.  *Id*.

**E. Testimonial Record**

Plaintiff appeared at a hearing before ALJ Joseph Hillegas on August 23, 2007.  AR 230-44.  Plaintiff told the ALJ that he lives alone, and that this causes him problems at times.  AR 234.  He said that his brother and sister help him with shopping and cleaning. AR 241.  Plaintiff confirmed that he had worked for about 23 years as a maintenance supervisor, and stated that he was laid off when the company went bankrupt.  AR 234.  Plaintiff's attorney stated that Plaintiff had a stroke in October 2005, and Plaintiff later answered "Yes" when the ALJ asked him to confirm that he had experienced three strokes at the end of 2005.  AR 235, 241.  Plaintiff's attorney contended that Plaintiff had been having problems with his gout since the late 1990s, and following a hospitalization and cane prescription at that time, his gait and arthritis had only worsened.  AR 236.  At this hearing, Plaintiff's attorney amended the onset date of his disability to June 1, 2004.  *Id*.

Plaintiff told the ALJ that he was treated by a doctor in the late 1990s and early 2000s. AR 237.  Plaintiff said that he first found out he had gout when he tore his leg and thought his leg was broken.  *Id*.  Upon being questioned, Plaintiff confirmed that he was not seeing a doctor in 2003 and 2004.  *Id*.  Plaintiff said symptoms of gout and arthritis in his knees, including the

swelling of his knees and ankles that had been occurring since the 1990s kept him from working at times when he was still employed as a maintenance supervisor.  AR 238.  Plaintiff stated that in 2002 and 2003 he had problems with his ankles and knees that prevented him from working for a day or two at a time, and that at times he had to crawl to the bathroom. AR 240.  Plaintiff explained that he'd been given a cane by a doctor in the late 1990s, and that he often used the cane at work before he was laid off.  AR 242.  Plaintiff testified that, following the bankruptcy of his employer, he tried to find work as a painter, but found it impossible because he could not climb ladders.  AR 239.  Plaintiff believed that, had his employer not closed, he would've been fired because the company was "ready to let me go. . . . They don't want me there no more."  AR 244.

**F.  The ALJ's Findings**

The ALJ began by finding that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2008.  AR 15.  Therefore, Plaintiff was required to establish disability on or before that date to be eligible for DIB.  The ALJ then applied the standard five-step process in order to determine if Plaintiff has satisfied his burden of establishing disability. *Id*.  The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of June 1, 2004, and that the claimant had the following medically determinable impairments: history of polycystic kidney disease, gout, hypertension, clogged arteries, cardiomyopathy, and a history of cerebral vascular accident.  *Id*.

The ALJ determined that while Plaintiff had been disabled since October 10, 2005, he did not have an  impairment or combination of impairments that had significantly limited his ability to perform basic work-related activities for twelve consecutive months prior to that date.  AR 18.  Thus, the ALJ ruled, prior to October 10, 2005, Plaintiff did not have a severe impairment or

combination of impairments.  *Id*.   The ALJ made his findings based on a two step process that evaluated: 1) whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms; and 2) the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities.  *Id*.

The ALJ found while the Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, . . . the claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible."  AR 19.  The ALJ noted that the burden of proof resided with Plaintiff to prove that he was disabled prior to October 10, 2005.  *Id*.  The ALJ proffered no immediate explanation for his determination of Plaintiff's lack of credibility, only later explaining, "[t]he undersigned notes that there is no medical evidence (records of treatments or examinations) in the record prior to October 2005."  AR 20.

Therefore, the ALJ decided that Plaintiff was not disabled prior to October 10, 2005, and thus could only collect DIB from that date.  AR 20.

## II. DISCUSSION

### A. Standard of Review

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial

evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings have support by such evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

The ALJ must review and consider pertinent medical evidence, review all non-medical evidence, and "explain [any] conciliations and rejections." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 122 (3d Cir. 2000).  However, "[t]here is no requirement that the ALJ discuss in [his] opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004); *see also Fargnoli v. Massanari,* 247 F.3d 34, 42 (3d Cir. 2001) ("[a]lthough we do not expect the ALJ to make reference to every relevant treatment note in a case where the claimant . . . has voluminous medical records, we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law."). The decision of the Commissioner cannot be allowed to stand if the the Commissioner did not take the entire record into account or failed to resolve an

evidentiary conflict. *Schonewolf v. Callahan,* 972 F.Supp. 277, 284-85 (D.N.J. 1997) (quoting *Gober*, 574 F.2d at 776).

In addition to the substantial evidence inquiry, this Court must also review whether the correct legal standards were applied in making the administrative determination. *See Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983). Legal issues are reviewed under the plenary standard. *See Sykes*, 228 F.3d at 262; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## B. Standard for Entitlement of Benefits

DIB may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements.  *See* 42 U.S.C. § 423(c).  Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. 42 U.S.C. § 1382c(a)(3)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. See 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he is not currently engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n. 5 (1987). If a claimant is

presently engaged in any form of substantial gainful activity, he/she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment"  or "combination of impairments"  that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-7 n. 5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling."  *Id*. A claimant who does not have a severe impairment is not considered disabled. 20 C.F.R. § 404.1520(c); *see Plummer*, 186 F.3d at 428. Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4) (iii). If the claimant demonstrates that his/her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his/her burden of proof and is automatically entitled to benefits. *See* 20 C.F.R. § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n. 5. If the specific impairment is not listed, the ALJ will consider in his/her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id*. An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he/she retains

the residual functional capacity to perform his/her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform his previous work, the claimant is determined to not be disabled. 20 C.F.R. § § 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his/her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n. 5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id*.

## C. Plaintiff's Appeal

The issue presented by this case is whether the ALJ correctly determined the onset date of Plaintiff's disability.  The onset date is the first day an individual is disabled as defined by the Act, and is significant here in that it affects the period of time for which Plaintiff can be paid DIB. Social Security Ruling 83-20, Program Policy Statement: Titles II and XVI: Onset of Disability (PPS-100), 1983 WL 31249 (S.S.A.1983) ("SSR 83-20").

Plaintiff argues that the ALJ, in finding Plaintiff's disability onset date to be October 10, 2005, two days after he was first hospitalized, failed to follow SSR 83-20.  Plaintiff contends that because his impairments were slowly progressing, and the record before the ALJ contained no medical documentation prior to October 8, 2005 due to Plaintiff's documented lack of income following his lay off in 2003, the ALJ was required by SSR 83-20 to call upon a medical expert

to deliver an opinion as to the likely onset of disability prior to the first medical entry in the record.  In support of his position, Plaintiff cites *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541 (3d. Cir. 2003) and *Beasich v. Comm'r of Soc. Sec.*, 66 F. App'x 419 (3d Cir. 2003).   Plaintiff seeks a determination that he was disabled as of June 1, 2004.  Alternatively, Plaintiff requests the case be remanded with instructions.

In response, the Commissioner argues that the ALJ properly found that Plaintiff's conditions did not cause more than minimal restrictions in Plaintiff's ability to perform basic work prior to October 10, 2005.  The Commissioner contends that it was within the ALJ's discretion whether to call a medical expert under SSR 83-20 because "the ALJ considered [P]laintiff's statement that he stopped working because he was laid off in April 2003 and the fact that [P]laintiff was unable to produce any medical evidence to corroborate his testimony that he had been diagnosed with polycystic kidney disease in 2002."  Defendant's Br. at 15.

For the reasons explained below, this Court finds that there was insufficient evidence to support the ALJ's finding of a disability onset date of October 10, 2005, and remands the case to the ALJ for further proceedings consistent with this opinion.

## 1. SSR 83-20

Regardless of how difficult the task may be, an ALJ must determine a disability onset date and have a substantial basis for doing so.  *See Newell*, 347 F.3d at 548.  SSR 83-20 sets forth the framework for determining the disability onset date and is binding on the Commissioner.  *See* 20 C.F.R. § 402.35(b)(1).   It provides instructions regarding how to determine the onset date of disabilities that are slowly progressing.  SSR 83-20 directs, in relevant part, that the following analysis is applied in such cases:

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling.

Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

Particularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e., be decided on medical grounds alone) before onset can be established. In such cases, consideration of vocational factors can contribute to the determination of when the disability began . . .

In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available. When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.

SSR 83-20 at *2-3.

Precise evidence of an onset date may not always be available.  Accordingly, SSR

83-20 also provides:

In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation. Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition . . .

SSR 83-20 at *3.

While SSR 83-20's language is permissive, this Circuit has held that there are times where SSR 83-20 and the substantial evidence rule dictate that an ALJ must call upon the services of a medical advisor rather than rely on his own lay analysis of the evidence. In *Newell*, the claimant argued, as Plaintiff here does, that the ALJ erred in failing to follow this SSR 83-20 formula. 347 F.3d at 548-49. The court agreed, holding that "the ALJ should have consulted a medical advisor to help him infer the onset date as required by SSR 83-20 and our decision in *Walton v. Halter*." *Id.* at 549. (footnote omitted). In *Walton*, the Third Circuit held that in a situation where the "impairment was a slowly progressive one and the alleged onset date was far in the past," the ALJ "must call upon the services of a medical advisor rather than rely on his own lay analysis of the evidence." 243 F.3d at 709. Similarly, in *Beasich*, the court reversed an ALJ's decision denying disability and held that the ALJ failed to apply SSR 83-20 properly and consult a medical advisor to infer the plaintiff's disability onset date. 66 F. App'x at 432. The holdings in these and other Third Circuit cases lend support to this Court's determination that the present case must be remanded.

In *Newell*, the plaintiff alleged that liver disease, diabetes, and neuropathy rendered her disabled beginning August 31, 1997, the date upon which her eligibility for widow's benefits expired. 347 F.3d at 543, 547. However, the plaintiff's impairments were not first documented until June 1, 1998. *Id*. at 543. At the hearing before the ALJ, the plaintiff testified that she had not sought treatment until June 1998 because she was uninsured. *Id*. The plaintiff explained that she only sought medical treatment when her father provided her with money to pay for her care. *Id*. With the exception of a billing statement reflecting that the plaintiff had received emergency room treatment for shoulder joint pain in 1993, the record before the court contained no medical

records between 1991 and June 1, 1998. *Id*. The ALJ found the plaintiff's statements concerning her pain and level of function not credible as a result, and only found her disabled as of June 1, 1998. *Id*. at 547-48. Thus, the ALJ determined that she was not entitled to widow's benefits. *Id*.

The *Newell* court held that, despite the plaintiff's lack of medical documentation of her disability prior to June 1, 1998, by not calling a medical advisor the ALJ had failed to follow SSR 83-20. *Id*. at 548-49. Thus, the court found for the plaintiff and remanded the case for further proceedings. The Third Circuit reasoned, "[i]n cases in which the onset date is critical to a determination of entitlement to benefits, an ALJ must grapple with and adjudicate the question of onset, however difficult." *Id*. The ALJ's failure to consider the only non-contemporaneous evidence  of the plaintiff's disabilities before June 1, 1998, which was her own testimony, was further held by the court to violate SSR 96-7p, Program Policy Statement: Titles II and XVI: Onset of Disability (PPS-100), 1996 WL 374186 (S.S.A.1983). *Id*. at 547-48. SSR 96-7p forbids an ALJ from using a claimant's lack of medical treatment as a justification for discrediting a claimant without considering the reasons given that may explain the irregular treatment. *Id*. at 548.

In *Beasich* and *Walton*, the Third Circuit was faced with plaintiffs that alleged onset dates far in the past. The plaintiff in *Beasich* applied for disabled adult child's benefits and Supplemental Security Income on October 8, 1996, alleging that he had a disabling psychiatric and neurological condition since July 1, 1981. 66 F. App'x at 420. The court ruled that SSR 83-20 required the ALJ to call a medical advisor to assist the court in inferring the onset date because the alleged onset date was far in the past and plaintiff's medical chronology was incomplete. *Id*. at 433-34.

Similarly, the plaintiff in *Walton* applied for child's DIB on August 14, 1992, alleging that he had been disabled by bipolar disorder-manic depression since before his twenty-second birthday on June 13, 1966.  243 F.3d at 705.  The plaintiff had first been diagnosed in 1971, and while contemporaneous medical records for the period following the diagnosis were extensive, pre-diagnosis records were "considerably more limited."  *Id*.  The plaintiff proffered letters from his treating physician that supported his claim, but the ALJ rejected his opinion "solely on the basis that his opinion was based on information supplied by Walton and not on personal observation of Walton during the relevant period."  *Id*. at 710.  Instead, the ALJ found that the plaintiff's failure to provide contemporaneous medical records acted as a bar to a finding that he was suffering from a severe emotional or mental impairment since 1966.  *Id*. at 708.  The Third Circuit reversed, holding that "an ALJ in a situation of this kind must call upon the services of a medical advisor rather than rely on his own lay analysis." *Id*. at 709.  Further, the Court held that even had a medical advisor been called, the ALJ would not have been permitted to reject the doctor's retrospective opinion:

> As SSR 83-20 clearly reflects, a conclusion regarding onset in a situation of this kind can, and frequently must, be based on information gathered after the fact from the claimant and, indeed, from other lay people like family and neighbors. The basis for a medical opinion is, of course, an indispensable element of a reasoned evaluation of it, and there are, of course, situations in which an opinion based on personal observation may be favored over one based on information supplied by the claimant. But this is a situation in which an opinion based on personal, contemporaneous observation was not available. In such a situation, SSR 83-20 calls for an ALJ to have the benefit of expert medical advice based on the best available data without regard to its source.

*Id*. at 710.

*Walton* and *Newell's* directive has been interpreted to apply in cases where the ALJ must infer the onset date based on an unclear medical record and the impairment at issue becomes

progressively worse over an extended period of time. *See Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 618 (3d Cir. 2009) (". . . further decisions of our court have confirmed that *Walton's* directive to seek out the services of a medical advisor is limited to situations where the underlying disease is progressive and difficult to diagnose, where the alleged onset date is far in the past, and where medical records are sparse or conflicting."); *Klangwald v. Comm'r of Social Sec.*, 269 F. App'x 202, 205 (3d Cir. 2008) (". . . we have generally applied SSR 83-20 only where medical evidence from the relevant period is unavailable."); *Kirk v. Comm'r Soc. Sec.*, 177 F. App'x 205, 208-09 (3d Cir. March 7, 2006) (ALJ did not err in not calling a second medical advisor when the plaintiff's "claim of an earlier onset create[d] a time period of only three years [and] [a]dditionally … the medical evidence available for the time period in question support[ed] the ALJ's conclusion regarding the onset date.").

A court in this district recently followed the same interpretation.  In *Mauriello v. Astrue*, No. 09-3360, 2010 WL 2079717, *1 (D.N.J. May 25, 2010), the plaintiff claimed that the ALJ was required to call a medical advisor.  The plaintiff had alleged an onset date of January 31, 2005, which was contrary to the ALJ's onset date determination of March 15, 2007.   *Id*. The plaintiff's medical records prior to the date inferred by the ALJ showed that plaintiff had been prescribed Zoloft and Paxil, had sought treatment for mental ailments, and complained of flashbacks.  *Id* at *1-2.   The plaintiff testified before the ALJ and explained how his conditions affected his decision to leave his job.    *Id*. at *5.   The ALJ found that while the plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible prior to March 15, 2007, to the extent they [were] inconsistent with the residual functional capacity assessment."  *Id*.

The *Mauriello* court found that the ALJ was not required by SSR 83-20 to call a medical advisor. *Id*. at *11. The court contrasted the facts before it with those of *Newell*, *Beasich*, and *Walton*, explaining that a medical advisor did not need to be called because the alleged onset date created a time period of "a little more than two years" and "[m]ost important, … the ALJ ha[d] access to adequate medical records from the time period in question to infer onset." *Id*. at *11. However, the court did remand the case for the ALJ to clarify his assessment of the plaintiff's credibility, explaining that the record conflicted with the ALJ's finding regarding when the plaintiff started taking psychotropic medicines. *Id*. Further, the court noted that, "the lack of contemporaneous medical evidence of an objective nature is not necessarily determinative as to the onset date, and to the extent the ALJ's decision was based on a legal determination that the onset date of an impairment had to be proved by such medical evidence, it is erroneous." *Id*. (citing *Barnhart*, 138 F. App'x at 508 (citing *Newell*, 347 F.3d at 547)). Therefore, the court explained that "if the ALJ believed that contemporaneous, medical evidence was necessary to corroborate [p]laintiff's testimony, the ALJ was in error." *Id*.

## 2. Plaintiff's Disability On-Set Date

This Court has not uncovered any case within this Circuit in which a court has been called on to consider the applicability of SSR 83-20 when a plaintiff suffering from slowly progressive impairments cannot proffer medical evidence prior to his first hospitalization and the difference between the first hospitalization (i.e., the onset date inferred by the ALJ) and the alleged onset date creates a time period of only seventeen months. However, recently in *Mauriello*, one district court summarized the caselaw considering the parameters of SSR 83-20 as follows:

> Subsequent case law has interpreted *Walton* and *Newell's* directive to apply only in cases where the impairment at issue becomes

progressively worse over an extended period of time and the ALJ must infer the onset date based on an unclear medical record. *See Bailey v. Comm'r of Soc. Sec.*, 354 Fed.Appx. 613, 618 (3d Cir. 2009 ("As the District Court noted, further decisions of our court have confirmed that *Walton's* directive to seek out the services of a medical advisor is limited to situations where the underlying disease is progressive and difficult to diagnose, where the alleged onset date is far in the past, and where medical records are sparse or conflicted."); *Klangwald v. Comm'r of Social Sec.*, 269 Fed.Appx. 202, 205 (3d cir. 2008) ("we have generally applied SSR 83-20 only where medical evidence from the relevant period is unavailable"); *Kirk v. Comm'r of Soc. Sec.*, 177 Fed.Appx. 205, 208-09 (3d Cir. 2006) (finding *Walton* inapplicable where plaintiff's claim of earlier onset created a time period of only three years and where medical evidence for relevant period supported ALJ's conclusion regarding onset date); *Jakubowski v. Comm'r of Soc. Sec.*, 215 Fed.Appx. 104, 108 (3d Cir. 2007) ("By contrast with *Newell* and *Walton*, as noted by the District Court, the ALJ in this case had access to adequate medical records from the time period before the expiration of Jakubowski's insured status, and these records did not support her alleged onset date.")

*Mauriello*, 2010 WL 2079717 at 10.  Accordingly, none of the courts which have considered whether SSR 83-20 required the ALJ to consult a medical advisor have done so in a situation such as this where the disease is a slowly progressive one and there is a lack of any medical evidence during the time period in question, but that time period spans only a short period of time.  Conversely, none of the courts that have considered the application of SSR 83-20 have indicated that a short time period between the alleged onset date and the date inferred by the ALJ alone is enough to preclude the application of SSR 83-20.  Indeed, in *Mauriello* while the court found that SSR 83-20 did not require the ALJ to consult a medical advisor pointing to the short time span between the inferred and the alleged onset dates, the court indicated that "most important" to its determination that SSR 83-20 was inapplicable was the fact that the record before the ALJ contained adequate medical evidence from which to infer an onset date.

The Third Circuit's past interpretation of SSR 83-20 makes clear that the existence of medical evidence, whether contemporaneous or non-contemporaneous, that substantially supports the ALJ's onset date inference is essential.   Here, the ALJ's decision that Plaintiff was not disabled prior to the date inferred by the ALJ, the same day that a treating physician noted that Plaintiff was exhibiting signs of stage 3 kidney disease and polycystic kidney disease, was not supported by medical evidence in the record.   There is no dispute that Plaintiff's ailments were slowly progressive.   The ALJ inferred Plaintiff's disability onset date after listening to Plaintiff's testimony, wherein he described the difficulties that characterized his daily life for the several years prior to his hospitalization on October 8, 2005.   The ALJ found while the Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, . . . the claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible."   The ALJ proffered no immediate explanation for this finding.   Yet in his decision finding that Plaintiff had failed to show that he had a severe impairment prior to October 10, 2005, the ALJ wrote, "[t]he undersigned notes that there is no medical evidence (records of treatments or examinations) in the record prior to October 2005."

As previously noted, Plaintiff explained that his lack of medical care prior to October 2005 was as a result of his lack of insurance and money, and the record reflects that Plaintiff had no FICA earnings after 2003. The ALJ was not free to disregard Plaintiff's testimony in the absence of countervailing medical evidence.  In *Newell* the Court explained that, "[r]etrospective diagnosis of an impairment, even if uncorroborated by contemporaneous medical records, but corroborated by lay evidence relating back to the claimed period of disability can support a finding of past impairment." 347 F.3d at 547 (allowing consideration of non-contemporaneous

medical evidence commencing seven months after plaintiff's date last insured).   Thus, as in *Mauriello*, to the extent that the ALJ believed that contemporaneous medical evidence was necessary to corroborate Plaintiff's testimony, the ALJ was in error.

Thus, in order for this Court to find that the ALJ's onset date determination was supported by substantial evidence such that the ALJ did not need to call a medical advisor, the ALJ's decision must contain other facts that would support a finding that Plaintiff became disabled on October 10, 2005.   The ALJ offered no explanation for his onset date inference other than Plaintiff's lack of medical care prior to October 8, 2005, and the ALJ did not explain the basis for his conclusion regarding Plaintiff's credibility, other than perhaps the absence of corroborative medical evidence, and as a result, his decision was not supported by substantial evidence.   Therefore, because Plaintiff was suffering from a slowly progressing disease and medical records from the relevant time period were unavailable, the ALJ should have followed SSR 83-20 and called a medical advisor.

### III. CONCLUSION

The ALJ's decision regarding Plaintiff's onset date is not supported by substantial evidence.   Accordingly, the Court remands with instructions to return this matter to the agency for further proceedings consistent with this opinion.

An appropriate order shall follow.

Dated: August 31, 2010

                              _/s/   Freda L. Wolfson_____
                              **United States District Judge**